CITY OF NORTH OLMSTED, Appellant,

v.

BULLINGTON, Appellee.

[Cite as *N. Olmsted v. Bullington* (2000), 139 Ohio App.3d 565.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 76224.

Decided Aug. 7, 2000.

*Bryan P. O'Malley,* for appellant.

*Brian M. Fallon,* for appellee.

*Alexandria M. Ruden,* Legal Aid Society of Cleveland, for *amicus curiae* Ohio Domestic Violence Network.

---

PATRICIA ANN BLACKMON, Judge.

This appeal raises for the first time in Ohio the question of whether a city may prosecute a domestic violence victim for aiding and abetting an offender in the violation of a temporary protection order ("TPO") issued for the victim's protection restraining the offender from contact with the victim. This question comes to us in an appeal by the appellant city of North Olmsted ("city") after the trial court dismissed the city's complicity complaint filed by it against appellee Laura Bullington.

The city assigns the following errors for our review:

"I.   The trial court committed prejudicial error in granting the defendant's motion to dismiss the complaint of complicity, contrary to Revised Code Section 2923.03(A)(1) & (2).

"II.   The trial court committed prejudicial error in deciding that it is impossible for an alleged victim of domestic violence to be accused of complicity in the alleged domestic offender's subsequent, reckless violation of a temporary protection order in violation of Revised Code Sections 2919.26 and 2919.27."

Having reviewed the record and the legal arguments of the parties, we affirm the trial court's decision.   The apposite facts follow.

On February 9, 1998, the Parma Municipal Court issued a temporary protection order against appellee Laura Bullington's husband for her protection following an alleged incident of domestic violence.   The TPO prohibited the husband from having any contact with Laura Bullington.   The terms of the TPO required Frank Bullington to refrain from entering Laura Bullington's residence or place of employment and included the following notice in bold type:

**"IF THIS ORDER REQUIRES YOU TO REFRAIN FROM ENTERING THE RESIDENCE, SCHOOL, BUSINESS OR PLACE OF EMPLOYMENT OF THE COMPLAINANT OR THE FAMILY OR HOUSEHOLD MEMBER(S) NAMED IN THIS ORDER, THIS ORDER CANNOT BE WAIVED OR NULLIFIED BY AN INVITATION TO YOU TO ENTER THEIR RESIDENCE, SCHOOL, BUSINESS OR PLACE OF EMPLOYMENT OR YOUR ENTRY INTO ONE OF THOSE PLACES OTHERWISE WITH THEIR CONSENT."**

On May 27, 1998, the North Olmsted police stopped a vehicle driven by Frank Bullington for a routine traffic violation.   Laura Bullington was in the passenger seat.   After receiving information identifying the parties, the police arrested Laura Bullington and Frank Bullington.   The police charged him with violating the terms of the TPO and charged her with complicity in the violation of the TPO. The complaint against Laura Bullington alleged that she recklessly aided, abetted, and/or solicited her husband to violate the no-contact terms of a TPO issued pursuant to R.C. 2919.26 in connection with a domestic violence case.[1]

Laura Bullington filed a motion to dismiss the complaint, alleging that it was legally impossible for her to be complicit in violating a protection order issued for her benefit.   The trial court granted her motion and dismissed the charges.   This appeal followed.

---

1.   The city convicted Frank Bullington of violating the TPO.   The record does not disclose the disposition of the underlying domestic violence charge.

For purposes of this opinion, we will address the city's assigned errors together. Our standard of review is whether the trial court erred as a matter of law in determining that the city's complaint did not allege facts constituting a crime under Ohio law. See *State v. McNamee* (1984), 17 Ohio App.3d 175, 17 OBR 306, 478 N.E.2d 843; *State v. O'Neal* (1996), 114 Ohio App.3d 335, 683 N.E.2d 105; *State v. Patterson* (1989), 63 Ohio App.3d 91, 577 N.E.2d 1165.

In *Patterson*, the court held a pretrial motion of this nature tests whether the complaint alleged facts constituting a violation of Ohio's criminal laws. In this case, Laura Bullington argues that the city lacked authority to criminally charge her for aiding and abetting her husband in the violation of a TPO issued for her protection and benefit.

The city argues that aiding and abetting is the proper charge for the facts of this case and that the impossibility defense utilized by Laura Bullington in her motion to dismiss is inapplicable. By framing the issue in this light, the city has glossed over the real concern. Our concern is not the meaning and the depth of the complicity laws but whether a victim of a crime in a protected class of a criminal law may be punished for its criminal violation.

The Ohio Supreme Court has recognized that domestic violence laws are special. *State v. Williams* (1997), 79 Ohio St.3d 459, 683 N.E.2d 1126. The issuance of a TPO is special under that law. The TPO is specific to the offender and defines specifically the forbidden, proscribed, and prohibited conduct of the offender. When the General Assembly enacted this law, it clearly intended that the victim could not by his or her action alter the effect of the law. The General Assembly intended that no victim could waive the effects of the TPO. To sanction what the city attempted to do here would in effect counter the General Assembly's intent that the TPO cannot be altered or waived. See *Reynoldsburg v. Eichenberger* (Apr. 18, 1990), Licking App. No. CA–3492, unreported, 1990 WL 52467 (wife could not consent to husband's return to the house after a TPO had been issued).

Moreover, by placing specific nonwaivability language in the law, the General Assembly recognized that sometimes whether volitional or under duress, the victim might allow the offender access to his or her person. Because of this possibility, the General Assembly made the law nonwaivable. The purpose was to protect the victim, which sometimes means protecting the victim from the victim's own actions or behavior.

Additionally, in so doing, the General Assembly focused absolutely on the behavior of the offender with intent to punish the offender's behavior and not the behavior of the victim, whom the order is designed to protect. To do otherwise

would make Laura Bullington responsible for her husband's action. The TPO restrains his behavior and makes him responsible for his own behavior.

Certainly, Laura Bullington could not have appeared at the husband's TPO violation hearing and testified that she made him violate the order; thus, he is innocent. No trial court would allow that kind of defense. The TPO targets the offender's behavior, not the victim's.

The domestic violence law requires the "preferred arrest" of a violator of an order and gives the trial court extensive authority to tailor the TPO to the exact situation before it at the time. *Felton v. Felton* (1997), 79 Ohio St.3d 34, 679 N.E.2d 672. The TPO is special in this regard because the offender, before the TPO hearing and at the time of the hearing to issue the TPO, is afforded specific due process guarantees, due process guarantees that would not have been contemplated for a would-be complicitor. It appears to us that any would-be complicitor would have to be given the same procedural due process notices before the complicitor could be charged as a violator of the order. In this case, Laura Bullington was not afforded due process; therefore, she may not be charged as an aider and abettor.

Both Laura Bullington's brief and the Ohio Domestic Violence Network's *amicus curiae* brief point out that the General Assembly specifically prohibited mutual protection orders. This inability to grant mutual protection orders would seemingly make it impossible to charge a person with complicity. See *State v. King* (1983), 10 Ohio App.3d 93, 10 OBR 116, 460 N.E.2d 1143 (partner cannot be criminally liable for the theft of a partnership). The rationale is that the orders would necessarily cancel each other out, thereby making the TPO meaningless.

As we pointed out earlier, this is a case of first impression. No cases exist exactly on point anywhere in the country. However, we may take guidance from an analogous case out of California. *People v. Meagan R.* (1996), 42 Cal.App.4th 17, 49 Cal.Rptr.2d 325. The facts of Meagan R. are as follows:

"[Joan] Rodriguez left her apartment on [Manducate] Road in Ramona at 11:30 a.m. after locking the door and securing the windows. Upon her return three days later, she found her home vandalized, the front window screen bent and the window open. Bleach had been poured over the carpets and furniture, food was strewn on the floor and her furniture had been slashed. Her cable television box, clock, perfume, tweezers and three pairs of socks were missing. Her remote control for the cable box was destroyed. She found a letter on her bed which read: 'thank you for the use of your bed. [Megan] and Oscar.' She knew no one named [Megan], nor did she ever give consent for this person to be in her apartment.

"[Joan] showed Desire [Renfrew], a neighbor, her damaged apartment and the note on the bed. [Renfrew] recognized the handwriting on the note as that of [Megan] from her computer class. [Renfrew] saw [Megan] in school and asked whether she knew Oscar and [Joan]. She replied she did, admitting she had poured bleach all over [Joan's] apartment and she and Oscar had sex in [Joan's] bed. [Megan] explained to [Renfrew] they went inside and were paying [Joan] back because she had cheated on Oscar. [Renfrew] related this conversation to [Joan] and they took the information to San Diego County Sheriff Deputy Michael Casey.

"During an interview at Olive Pierce Elementary Junior High School, the 14–year old [Megan] told Casey she entered the apartment with Oscar after Oscar removed a screen, opened a window next to the front door and then opened the door from the inside. She said Oscar had written the note and she merely signed it; however, she later admitted she wrote the note at Oscar's direction. She further told Casey that when she walked into the apartment, the vandalism had already taken place. While there, Oscar showed her some socks, telling her he had given the socks to [Joan] and asked her if she wanted them. She said she did, so Oscar placed the socks in a knapsack and they removed them from the apartment.

"* * *

"[The State charged [Megan] R. with burglary, trespassing and vandalism.]

"On December 8, the juvenile court found true the allegations [Megan] had committed burglary and vandalized property valued at less than $1,000. As to the burglary count, the court found she had entered [Joan's] residence with the intent to commit a felony, not theft. The court reasoned if she facilitated Oscar's commission of statutory rape, she aided and abetted her statutory rape. The court thus found she committed residential burglary by entering the residence with the intent to perpetrate or aid and abet her own statutory rape." *Id.* at 20–21, 49 Cal.Rptr.2d at 327.

The appellate court reversed Meagan's burglary conviction. *Id.* at 27, 49 Cal.Rptr.2d at 332. The court reasoned that an aider and abetter must have the necessary criminal intent to commit the offense. *Id.* Moreover, the court held that a victim who is a member of a protected class of a criminal law may not be charged with violating a provision of that criminal law. *Id.* at 27, 49 Cal.Rptr.2d at 332.

The court also made the following observation in a footnote:

"The People also rely on *People v. Young* (1933), 132 Cal.App. 770, 772 [23 P.2d 524], where the court held a female could be held liable for assisting a male in violating the penal statutes prohibiting pimping. However, the female charged in

*Young* was not the intended victim of the statute. Moreover, in *Williams v. Superior Court* [1973], *supra,* 30 Cal.App.3d [8] at page 14 [106 Cal.Rptr. 89 at page 92–93], the court held the act of prostitution could not be elevated from a simple misdemeanor to a felony by charging the prostitute with conspiring with her pimp, since the prostitute was liable for an act under a more specific statute." *Id.* at 26, 49 Cal.Rptr.2d at 331.

██ Here, the victim of a TPO is a member of the protected class designated for protection from violent abusers. Consequently, the victim may not be charged as an aider and abetter in the violation of a TPO by an offender.

It appears to us that the city showed a certain degree of impatience with the victim in this case, and the arresting officer attempted to make the victim responsible for the offender's behavior. The city is obviously concerned about this issue. However, we believe this is not the way to solve its perceived or imagined problems. The protection order is targeted for a specific offender for that offender's behavior at the time of its issuance. Neither the city nor police officers may alter those facts to fit a particular bias or assumption.

Additionally, any number of reasons may exist for a victim's being in the offender's presence. Many of these reasons may not be volitional, even though they may appear on the surface to be so. Consequently, to allow the city to focus on the victim's behavior abrogates the General Assembly's historical efforts to require police officers to turn their attention from the victim's actions and place their attention squarely where it belongs, on the offender's behavior. Accordingly, we hold as a matter of law that the trial court correctly dismissed the complaint against Laura Bullington.

*Judgment affirmed.*

TIMOTHY E. MCMONAGLE, P.J., concurs.

JAMES D. SWEENEY, J., concurs in judgment only.